1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| LAWRENCE RICHARDSON | CIVIL ACTION |
|---|---|
| Plaintiff, | NO. 15-5848 |
| VERSUS | SECTION "H" |
| | JUDGE: MILAZZO |
| FAMOUS BOURBON MANAGEMENT GROUP, INC. AND FIORELLA'S ON DECATUR, INC., D/B/A JAZZ CAFE, FIORELLA'S CAFE AND BEERFEST | MAG. 3 |

DEPOSITION OF FAMOUS BOURBON MANAGEMENT GROUP, INC., through its designated representative, JOSEPH ASCANI, given in the above-entitled cause, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, at the Pelican Law Group, 1515 S. Salcedo, Suite 130, New Orleans, Louisiana, on the 7th day of September, 2016.

**SOUTHERN COURT REPORTERS, INC.**
(504) 488-1112



Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 2 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 2 of 19

14

```
 1   of a judge or jury?
 2   A.     I do.
 3   Q.     And it will also be helpful when you are
 4   asked a yes or no question you say yes or no
 5   rather than uh-huh or na-huh, because that's
 6   difficult to decipher in the transcript.  Is
 7   that fair?
 8   A.     Yes.
 9   Q.     We had some talk previously on the record
10   about your role in this deposition.  This
11   deposition is noticed, in part, for the two
12   corporations I previously named.  You understand
13   that you are giving answers on behalf of those
14   corporations as well as yourself individually?
15   A.     Absolutely.
16   Q.     Is it fair that you will let me know
17   whether or not that changes throughout the
18   deposition, whether something is something you
19   can only say personally as opposed to being on
20   behalf of Famous Bourbon Management Group, Inc.
21   and Fiorella's on Decatur, Inc?
22   A.     You'll be the first to know.
23   Q.     Did you have an opportunity to review the
24   topics listed, and I'll show you what has
25   previously been marked in the prior part of the
```

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 3 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 3 of 19

16

1   A.      Oh, you're not going to read it to me?
2   Okay.  I am the chief operating officer of this
3   company.  No schedules are made without my
4   approval.  Every individual location submits a
5   schedule on a Thursday, and that schedule is in
6   anticipation for the schedule to be used on a
7   Monday.  Once the schedule is made, the schedule
8   is posted by the restaurant.
9   Q.      Right now my questions are not so much
10  about the substance of those topics, but if you
11  did anything prior to and in preparation for
12  this deposition --
13  A.      Yes.  I went through the files.
14  Q.      Let me finish my question, please.
15  A.      Okay.
16  Q.      If you did anything to investigate and
17  inform yourself of knowledge you didn't
18  personally have prior to this deposition.  For
19  Topic 1 did you do so?
20  A.      What I did for Topic 1 is review all of
21  the files for these companies.  Okay.  I looked
22  for evidence that your client actually worked in
23  these locations.
24  Q.      When you say reviewed files, what does
25  that mean?

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 4 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 4 of 19

48

```
 1   capacity.  Implementation of new programs that
 2   we want to adopt, marketing and strategy for
 3   each one of the locations, fundamental money,
 4   security, cash handling.  There is a lot more,
 5   but that's the ones that come right off the top
 6   of my back.
 7   Q.     Do you serve in any capacity for an entity
 8   called 327 Bourbon Street, Inc.?
 9   A.     Temptations.
10   Q.     That is Temptations?
11   A.     That's right.
12   Q.     What do you do for Temptations?
13   A.     Computer work.
14   Q.     What does that mean?
15   A.     Specials, checking out, making sure prices
16   haven't been adjusted, marketing concepts and
17   ideas, facility update, upkeep, authorizing
18   construction crews and the like.
19   Q.     Do you serve any capacity or role in an
20   entity called Temptations, Inc.?
21          MR. PANAGOULOPOULOS:
22               Objection, relevance.
23          THE WITNESS:
24               Temptations, Inc. is -- I don't
25   serve a role in that.  I serve a general COO
```

```
 1  Temptations, Scores, Lipstixx, all of them.
 2  BY MR. JACKSON:
 3  Q.      What about Fais Deaux Deaux?
 4          MR. PANAGOULOPOULOS:
 5               Objection, relevance.
 6          THE WITNESS:
 7               Fais Deaux Deaux?  Yeah.  It's a
 8  little bit different there.  There is about five
 9  or six Fais Deaux Deauxs out there.
10  BY MR. JACKSON:
11  Q.      You do do something different at those --
12  A.      Yeah.
13  Q.      What's different?
14  A.      Different is I have to go back to the
15  manager, you know, looking at the food cost, the
16  beverage cost, labor cost, looking at production
17  and sales, the sales comp out there, looking at
18  cash accountability.  It's the same thing I do
19  with the restaurants and bars only or a
20  combination of both.  That's where the Fais
21  Deaux Deaux lays.
22  Q.      So you do less there than the other
23  locations?
24  A.      Oh, no.  I do a lot.  I do more there than
25  at the gentlemen's clubs, because I don't have
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 6 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 6 of 19

53

```
 1  any physical -- I don't get involved with who
 2  they hire, what manager they hire, or how many
 3  girls they are going to bring in.  I don't
 4  manage that.
 5  Q.     But you do with the non-gentlemen club
 6  entities?
 7  A.     Yes.
 8         MR. PANAGOULOPOULOS:
 9             Objection, relevance, as it relates
10  to anything other than the named defendants.
11  BY MR. JACKSON:
12  Q.     What is it that you do in that capacity at
13  those other places?
14  A.     At the other places?
15         MR. PANAGOULOPOULOS:
16             Objection, relevance.
17  BY MR. JACKSON:
18  Q.     You said you get involved with employment
19  and hiring.  How so?
20  A.     Let's just take one at a time, but it's
21  the same in all of them.  Okay.  I just want to
22  be clear so I don't have to do this for every
23  single location.  Let's say Jazz Cafe.  I hire a
24  manager.  I make sure that I pick the manager
25  for that location, make sure the manager gets
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 7 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 7 of 19

54

```
 1  trained, make sure the manager understands our
 2  policies and procedure. I show them how a
 3  schedule is to be made. I show them what labor
 4  percent we want to run. I show them what food
 5  costs we want to run out of this location. I
 6  show them the marketing that's going to take
 7  place for each and every relocation. I mean for
 8  his location, and then I give him the autonomy
 9  based on me being able to train him to do this.
10  I give him the autonomy to hire his bartender,
11  hire his waitress, to hire his cooks, to hire
12  his kitchen people with certain guidelines. His
13  guidelines will be that he could hire them if
14  they fit what our overall objectives are. I
15  give him constraints what he can hire them for.
16  I do not allow a manager to hire another manager
17  in a location. They can have a first interview.
18  I make the final determination.
19              I choose vendors for each one of the
20  locations. I also choose the liquor people. I
21  make sure that I've established the par on the
22  food. I also make sure that I've established
23  the par on the liquor. Whether it's liquor or
24  whether it's beer, there is a par in each
25  location. I make sure that they understand cash
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 8 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 8 of 19

55

1  accounting, and then I monitor them. That's
2  pretty much it. It sounds simple, but it ain't.
3  Q.     Do you have the power to hire and fire
4  those managers you hired?
5  A.     Yes.
6  Q.     Who gave you that authority?
7  A.     I get that authority with the position
8  when I came in to this company. That's the only
9  way I would come in, is to have control over the
10 operation.
11 Q.     Who individually said you have that power?
12 A.     Well, it depends on if we're talking still
13 about the restaurants and bars, that would be
14 Trey. On the other end, that would have been
15 Pam, but I don't have the power to hire and
16 fire, so I take that back. I don't have the
17 power to hire and fire inside the gentlemen's
18 clubs. I don't do that. That's not a part of
19 my role.
20 Q.     What about the bars and the restaurants?
21 A.     The bars and the restaurants.
22 Q.     You do?
23 A.     I do.
24 Q.     Who has that power at the gentlemen's
25 clubs?

56

```
 1         MR. PANAGOULOPOULOS:
 2              Objection, relevance.
 3         THE WITNESS:
 4              That's done by Ray.
 5  BY MR. JACKSON:
 6  Q.   Who is Ray?
 7  A.   He is somebody that's been working down --
 8         MR. PANAGOULOPOULOS:
 9              Objection, relevance, as it relates
10  to that.
11         THE WITNESS:
12              -- in the French Quarter.
13  BY MR. JACKSON:
14  Q.   What is Ray's last name?
15  A.   Palazollo.
16         MR. PANAGOULOPOULOS:
17              Objection, relevance.
18  BY MR. JACKSON:
19  Q.   Do you have the power to hire and fire the
20  employees at the restaurant and bar locations
21  directly?
22  A.   I could.  I don't usurp somebody's
23  authority.
24  Q.   You have in the past?
25  A.   Oh, no, only when I see something flagrant
```

```
 1  like theft or like fraud.
 2  Q.     So yes?
 3  A.     I have in the past, yes, but I don't like
 4  doing it.  That's not the way I operate.
 5  Q.     You tell the managers to do it?
 6  A.     No.
 7  Q.     Do they come to you and ask?
 8  A.     If I don't have any authority in the
 9  gentlemen's clubs, and Ray is doing this, and if
10  I have a problem, I go to him.
11  Q.     In the bars and restaurants, do those
12  local managers ask your advice and permission to
13  fire people below them?
14  A.     Absolutely.
15  Q.     In the entities that we named thus far,
16  when I was asking you the list for which you
17  operate as COO, how do those entities relate to
18  Famous Bourbon Management Group, Inc.?
19  A.     They really don't.  They don't relate to
20  that, as far as I know, and, like I said, you
21  are better asking the accountant for this,
22  because I really don't know.  I don't have any
23  authority there.
24  Q.     What is Famous Bourbon Management Group,
25  Inc.?
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 11 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 11 of 19

67

1  Famous Bourbon Management.  That would be done
2  by multiple checks.  Reallocate my expense per
3  unit.
4  Q.    Explain that to me.
5  A.    Since we keep all our parts separated,
6  Bourbon Management would give me a check.  If it
7  was for Stiletto's that I was allocating my time
8  to, it would be paid there.  If it was Beerfest,
9  it would be paid there.  If it was Scores, it
10 would be paid from there.
11 Q.    Is it your testimony you get multiple
12 checks a week?
13 A.    That's right.
14 Q.    Every week?
15 A.    That's right.
16 Q.    Do you bill your time?
17 A.    Yes, I do.
18 Q.    But always from Famous Bourbon Management
19 Group, Inc., is the payee?
20 A.    That's right.
21 Q.    Why is it done that way?
22 A.    Well, I -- why do I bill?  Because I want
23 to keep track of the work that I do so I can get
24 accurately paid.
25 Q.    Why is --

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 12 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 12 of 19

73

```
 1   Q.    How and the manner in which somebody gets
 2   paid?
 3   A.    I guess that's me.
 4   Q.    You guess that's you?
 5   A.    Yeah. Pay practice. I'm not sure what
 6   pay practice is.
 7   Q.    You said you monitor labor and food costs
 8   as far as your job duties?
 9   A.    Yes.
10   Q.    Is there anybody else that does that?
11   A.    No.
12   Q.    Just you?
13   A.    Just me.
14   Q.    Is there a reason that Guy Olano, III,
15   would have testified that Guy Olano, Jr., would
16   have information about policies and pay
17   practices and would be the best source of that
18   information?
19   A.    Is there a reason why he did that?
20   Q.    Do you know?
21         MR. PANAGOULOPOULOS:
22              Objection. Calls for speculation.
23         THE WITNESS:
24              Maybe because he does. Is that what
25   Trey said?
```

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 13 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 13 of 19

74

```
 1   BY MR. JACKSON:
 2   Q.     He said that you monitor cleanliness of
 3   these locations that we've been talking about.
 4   How do you do so?
 5   A.     Physical inspection.
 6   Q.     You go around to each restaurant and bar
 7   and monitor it for cleanliness?
 8   A.     Yes.
 9   Q.     If it is uncleanly, what do you do?
10   A.     Talk to the manager.
11   Q.     That includes Fiorella's, Jazz Cafe, and
12   Beerfest in the past four years?
13   A.     Yeah, and probably more.
14   Q.     You said part of your job duties were to
15   monitor the quality of product.  What does that
16   mean?
17   A.     Go in there, get a plate, send some people
18   in there, get a plate, get comments.  What did
19   it look like?  How did it taste?  What was the
20   quantity?  What was the price like?
21   Q.     If it does not meet your standards, what
22   do you do?
23   A.     Go back into the restaurant, find out who
24   was working.  Talk to the manager that's there.
25   If it happens not to be the head manager of the
```

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 14 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 14 of 19

75

```
 1   place, have him present in the conversation.
 2   Tell him what is acceptable and unacceptable and
 3   figure out what we need to do in order to
 4   correct the problem.
 5   Q.    Who sets the quality standards?
 6   A.    Me.
 7   Q.    Anyone else?
 8   A.    No.
 9   Q.    Did any of the locations we've spoke about
10   previously exist prior to you returning in 2006?
11   A.    Yes.
12   Q.    Which ones?
13   A.    That would be 420 Bourbon, which is now
14   Lipstixx.  It was Trophies.
15   Q.    What about the bars and restaurants?
16   A.    Wait a minute.  I'm not finished.
17   Stilettos.  That's 325 Bourbon.  Those two were
18   already existing.  Yeah.  That's really about
19   it.
20   Q.    Did any of the bars and restaurants exist
21   prior to 2008?
22   A.    Yeah.  Bar and restaurants, yeah.
23   Q.    Which ones?
24   A.    Fiorella's.  Not quite Bamboula's.
25   Beerfest.  Both Beerfests.  There is a Beerfest
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 15 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 15 of 19

76

```
 1   in the 300 block and a Beerfest in the 400
 2   block, but we gave up one of the locations, so
 3   we don't have that one any longer.  That would
 4   have been in existence.  Scores.  Yeah.  I
 5   failed to mention Temptations was in existence
 6   prior to 2006.  I think Temptations was in
 7   existence in the late nineties.
 8   Q.    Did anyone related to the Olano family own
 9   or have an interest in Beerfest or Fiorella's
10   prior to 2006?
11         MR. PANAGOULOPOULOS:
12              Objection, relevance.
13         THE WITNESS:
14              Prior to 2006, did they have it --
15   are you saying did they have an interest in it
16   before it was Beerfest?
17   BY MR. JACKSON:
18   Q.    No.  I'm asking -- yes.  That's my
19   question.
20   A.    No.
21   Q.    What about Fiorella's?
22   A.    Fiorella's, no.
23   Q.    Who owned it prior to that?
24   A.    Remember that guy Frank Dracose owned
25   Fiorella's.  He owned Fiorella's.  Before
```

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 16 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 16 of 19

77

```
 1   Beerfest -- it was Beerfest.  What was it?  I
 2   don't remember what business was there, but it
 3   wasn't Beerfest.  He didn't have an ownership in
 4   either Beerfest before it was Beerfest.
 5   Q.    Once it became under the ownership of the
 6   Olano family, you started instituting policies
 7   at Fiorella's and Jazz Fest?
 8   A.    Yes.
 9   Q.    You mentioned implementation being a part
10   of your job duties at these locations?
11   A.    Yeah.
12   Q.    What does that consist of?
13   A.    Well, I get these ideas that are going to
14   save the company money.  It works beautiful on
15   paper, but I got to bring it down to the store
16   level.  I go in there and make sure everybody
17   understands what the new policy is, whether it's
18   how we charge people or, you know, how we, you
19   know, how we keep the dollar bills in a cash
20   drawer.  Just whatever the policy is that I'm
21   working on.
22   Q.    Do you have anyone you report to?
23   A.    No.  I talk to Trey.
24   Q.    What does he do on a daily basis?
25   A.    I know not exactly.  I do know he does a
```

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 17 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 17 of 19

91

| | |
|---|---|
| 1 | Q.    What is the understanding of the |
| 2 | requirement to pay overtime? |
| 3 | A.    Anything after 40, they get paid time and |
| 4 | a half. |
| 5 | Q.    Do the locations, the bars and restaurants |
| 6 | we've discussed, to this point, have a policy in |
| 7 | place to ensure that that occurs? |
| 8 | A.    Yeah. Actually, what happens is they set |
| 9 | their schedule.  I make sure that we're not |
| 10 | scheduling overtime.  Okay.  If we are, then I |
| 11 | make a note of it and immediately notify Aimee |
| 12 | that we have no choice but to schedule overtime. |
| 13 | So when they give me the schedule for approval, |
| 14 | they run the hours that are being scheduled. |
| 15 | When a week -- when a pay week ends, they get it |
| 16 | and send it over to me to show me what the |
| 17 | payroll is, how many dollars we spent.  I look |
| 18 | at it, and I give my approval on it and fax it |
| 19 | to Aimee. |
| 20 |         Aimee gets it, and she pays based |
| 21 | on, I guess, what Guy, II, or Jr., Guy, Jr., |
| 22 | says okay. Joe signed it. It's fine. Send it |
| 23 | out.  But he's got to make sure that I've seen |
| 24 | every payroll, because sometimes they wasn't |
| 25 | sending them to me.  They were bypassing me and |

Case 2:15-cv-05848-JTM-DMD Document 111-6 Filed 04/18/17 Page 18 of 19
Case 2:15-cv-05848-JTM-DEK Document 70-6 Filed 12/07/16 Page 18 of 19

151

1  employee. If they were employed by our company,
2  there is a process in which they go through in
3  order to be terminated, but temporary labor,
4  they don't work the next day.
5  Q.      You mentioned that with termination of
6  employees, you oversee that, correct?
7  A.      Correct.
8  Q.      Regarding the termination of usage of day
9  labor, who oversees that for each location?
10 A.      Those are calls made to me, because
11 they've exceeded their scheduled hours. If I
12 approve it, then the manager facilitates the
13 payment out of the register.
14 Q.      In the event there is a decision to no
15 longer have a day laborer be used at a
16 particular location, who makes that decision?
17 A.      That would be me.
18 Q.      Is there any event where a manager at a
19 location who sought out the use of day labor
20 would decide whether or not that day labor would
21 continue to be used in the forthcoming days?
22 A.      No.
23        MR. PANAGOULOPOULOS:
24              No further questions.
25              [End of deposition.]

Case 2:15-cv-05848-JTM-DMD   Document 111-6   Filed 04/18/17   Page 19 of 19
Case 2:15-cv-05848-JTM-DEK   Document 70-6   Filed 12/07/16   Page 19 of 19

152

```
 1                    C E R T I F I C A T E

 2

 3              This certification is valid only
   for a transcript accompanied by my original
 4 signature and original required seal on this
   page.
 5
                I, SANDRA P. DIFEBBO, Certified
 6 Court Reporter, in and for the State of
   Louisiana, as the officer before whom this
 7 testimony was taken, do hereby certify that
   JOSEPH ASCANI, after having been duly sworn by
 8 me upon authority of R.S. 37:2554, did testify
   as hereinbefore set forth in the foregoing 151
 9 pages;

10              That the testimony was reported
   by me in stenotype, was prepared and transcribed
11 by me or under my personal direction and
   supervision, and is a true and correct
12 transcript to the best of my ability and
   understanding;
13
                That the transcript has been
14 prepared in compliance with transcript format
   guidelines required by statute or by rules of
15 the board, that I have acted in compliance with
   the prohibition on contractual relationships as
16 defined by Louisiana Code of Civil Procedure
   Article 1434 and in rules and advisory opinions
17 of the board;

18              That I am not related to Counsel
   or to the parties herein, nor am I otherwise
19 interested in the outcome of this matter.

20

21

22
       [signature: Sandra P. DiFebbo]
23     _____
       Sandra P. DiFebbo,
24     Certified Shorthand Reporter

25     Date: 9-26-16
```

**SOUTHERN COURT REPORTERS**

**(504) 488-1112**