1

```
 1          UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF LOUISIANA

 3

 4   LAWRENCE RICHARDSON          CIVIL ACTION
                                  NO. 15-5848
 5       Plaintiff

 6       VERSUS                   SECTION "H"
                                  JUDGE MILAZZO
 7   FAMOUS BOURBON MANAGEMENT    MAGISTRATE 3
     GROUP, INC. AND FIORELLA'S   MAGISTRATE KNOWLES
 8   ON DECATUR, INC. D/B/A JAZZ
     CAFE, FIORELLA'S CAFE AND
 9   BEERFEST

10       Defendants

11

12          30(b)(6) deposition of FAMOUS BOURBON

13   MANAGEMENT GROUP, INC. AND FIORELLA'S ON DECATUR,

14   INC., through its designated representative,

15   GUY OLANO, III, and GUY OLANO, III personally,

16   given in the above-entitled cause, pursuant to the

17   following stipulation at the offices of

18   JACKSON+JACKSON, 201 St. Charles Avenue, Suite

19   2500, New Orleans, Louisiana, on Tuesday, the 9th

20   day of August, 2016, commencing at 9:12 a.m.

21

22   REPORTED BY:

23

24   CHERYL L. OHLMEYER
     CERTIFIED COURT REPORTER

25
```

ORIGINAL

12

1   and were fighting an eviction.  Those are the only

2   ones off the top of my head that I can recall.

3        Q.     Have either of the entities been

4   involved with an employment-related lawsuit in the

5   past, whether it be because of wage issues or

6   discrimination or termination, anything of that

7   nature?

8        A.     Not to my knowledge.

9        Q.     How many companies are you involved

10  with?

11       A.     Give me a moment.  Between 10 and 15 I

12  believe.

13       Q.     Do you know the names of them?

14       A.     Yes, I do.

15       Q.     Can you tell me?

16              MR. PANAGOULOPOULOS:

17                   Objection, relevance at this point.

18  Go ahead.

19              THE WITNESS:

20                   Okay.  Sweet Things of Metairie,

21  Inc., The Dock at Slidell, Inc., Sweet Things of

22  Louisiana, Inc., Labeauti, Inc., Fiorella's on

23  Decatur, Inc., Jaxx House, Inc., Bamboula's, Inc.,

24  Fais Deaux-Deaux, Inc., Orleans Jazz 'N Blues

25  Venue, Inc., Phoenix Max, Inc., Famous Bourbon

1 Management Group, Inc.  I think that might be all

2 of them.

3 BY MR. JACKSON:

4     Q.     What is your position at those

5 companies?

6     A.     It varies from company to company.  Most

7 of them I believe I'm the president of the

8 corporation.  A couple of them I might be

9 secretary/treasurer.  Without having the corporate

10 documents in front of me, though, I wouldn't be

11 able to tell you for sure which one is which with

12 absolute certainty.

13     Q.     Is your father involved with each of

14 those companies?

15     A.     As the chief financial officer, yes.

16     Q.     And Ms. Tauzier, is she involved with

17 each?

18     A.     She works in our business office, which

19 handles each of those corporations.

20     Q.     What do you mean by that?

21     A.     She handles the payroll and the accounts

22 payable for each corporation.

23     Q.     There is no separate office handling

24 those matters for each corporation?

25     A.     For each of those corporations?  We have

1     **A.**     I have some knowledge.

2     **Q.**     Tell me what businesses it is associated

3  with.

4     **A.**     I believe it would be associated with

5  our businesses that are located in New Orleans.

6     **Q.**     Okay.  What are those?

7     **A.**     What businesses are those?

8     **Q.**     Yes.

9     **A.**     It would then be some of the businesses

10  which I already listed, but I'll go through it

11  again.  Labeauti, Inc.

12     **Q.**     Where is that?

13     **A.**     It's on Bourbon Street.

14     **Q.**     What is it?

15     **A.**     It's a bar.

16     **Q.**     Okay.

17     **A.**     Jaxx House, Inc.

18     **Q.**     Where is that?

19     **A.**     It's on Decatur.

20     **Q.**     What is it?

21     **A.**     It's a restaurant.  Temptations, Inc.

22     **Q.**     Where is that?

23     **A.**     On Bourbon Street.

24     **Q.**     What is that?

25     **A.**     A gentleman's club.  Bourbon Burlesque

1  Club, Inc.

2  **Q.**   What location is that?

3  **A.**   That's on Bourbon Street, also.

4  **Q.**   And what kind of entity is that?

5  **A.**   Again, that's a -- oh, what entities?

6  **Q.**   What kind of business?

7  **A.**   It's a gentleman's club, also.  Fais

8  Deaux-Deaux, Inc.

9  **Q.**   And how do you spell that?

10  **A.**   F-A-I-S then D-E-A-U-X and D-E-A-U-X.

11  **Q.**   And what business is that?

12  **A.**   That's a bar.

13  **Q.**   Where at?

14  **A.**   On Bourbon Street.  Silver Bourbon, Inc.

15  **Q.**   Where is that?

16  **A.**   On Bourbon Street.

17  **Q.**   What kind of establishment?

18  **A.**   Gentleman's club.  Platinum Bourbon,

19  Inc.

20  **Q.**   Where is that?

21  **A.**   Bourbon Street.

22  **Q.**   Is that a gentleman's club?

23  **A.**   Yes.

24  **Q.**   What else?

25  **A.**   Brass Bourbon, Inc., a gentleman's club

1  on Bourbon Street, or not a gentleman's club, adult

2  entertainment club.

3      Q.     What's the difference?

4      A.     These are male entertainers.

5      Q.     Okay.  You said that's on Bourbon

6  Street?

7      A.     Yeah.

8      Q.     All right.

9      A.     And Fiorella's on Decatur, Inc.

10      Q.     Okay.

11      A.     And that's on Decatur and restaurant.  I

12  believe that's all of them.

13      Q.     Of those, do they have trade names under

14  which they operate, such as Labeauti, Inc.?  What

15  would be on the sign at that location?

16      A.     Beerfest.

17      Q.     Jaxx House?

18      A.     Jazz Cafe.

19      Q.     Temptations, Inc.?

20      A.     Stilettos.

21      Q.     Bourbon Burlesque, Inc.?

22      A.     Temptations.

23      Q.     Fais Deaux-Deaux?

24      A.     That would be Fais Deaux-Deaux, also.

25      Q.     Silver Bourbon, Inc.?

1    **A.**    Scores.

2    **Q.**    Platinum Bourbon, Inc.?

3    **A.**    Lipsticks.

4    **Q.**    Brass Bourbon, Inc.?

5    **A.**    Bourbon Bad Boys/Fishbowl Sold Here,

6 and, also, I need to make a correction to a couple

7 of them.

8    **Q.**    Okay.

9    **A.**    Stilettos is Stilettos/Fais Deaux-Deaux

10 on their license.  Lipsticks is Lipsticks/Fais

11 Deaux-Deaux.

12    **Q.**    Okay.  And Fiorella's on Decatur is just

13 Fiorella's?

14    **A.**    Fiorella's, yes.

15    **Q.**    I started out asking the association.

16 What does Famous Bourbon Management Group Inc. do

17 on behalf of these other companies that you've

18 mentioned?

19    **A.**    Give me a second, please.  To my

20 knowledge, we use those corporations for banking

21 purposes to reduce the amount of accounts that we

22 need at the bank where we have a couple of main

23 accounts where we would write our checks from for

24 each location, some of them being accounts payable,

25 some of them being payroll, some of them being a

1  separate checking account for beer and alcohol, and

2  I think for our rent, a separate account to handle

3  our rents to our landlords.

4      Q.    Okay.  So if I understand you correctly,

5  the payroll, for instance, is written for each

6  employee in an account owned and operated and in

7  the name of Famous Bourbon Management Group?

8      A.    To my knowledge, yes.

9      Q.    Who signs those checks?

10     A.    It would vary from business to business.

11     Q.    Who are all the possible persons?

12     A.    And when you say sign, we actually don't

13  physically sign the checks.  ADP had received

14  signature cards.  So when they print out the

15  checks, it prints up with the appropriate signature

16  for each location.

17     Q.    Okay.  And ADP is the source of the

18  physical checks for employees under that umbrella

19  of companies under Famous Bourbon Management Group;

20  is that accurate?

21     A.    Correct.

22     Q.    And the individual in those cases that

23  would submit after collecting time from each entity

24  would be either Ms. Tauzier or Fruchtnicht?

25     A.    Correct.

33

1     Q.     Any kind of ownership, anything other

2    than leasing.

3     A.     No.

4     Q.     How about Fiorella's?

5     A.     No.

6     Q.     What about Beerfest?

7     A.     No.

8     Q.     Are those all Motwani properties?

9            MR. PANAGOULOPOULOS:

10                 Objection, relevance.

11           THE WITNESS:

12                 No.  I don't believe they are.

13   BY MR. JACKSON:

14     Q.    There are variations in who is listed

15   member/manager in each of the companies you've

16   listed.  Is that accurate?

17     A.    Correct.

18     Q.    Why is that?

19     A.    Just over the course of time, we

20   structured things differently.

21     Q.    Is it fair to say despite that

22   structure, the policies emanate from your father

23   for each of those companies?

24     A.    Yeah.  I think that's fair to say.

25     Q.    Has Famous Bourbon Management Group,

1          I would have to see the document to

2   know for sure.

3   BY MR. JACKSON:

4       Q.    So you don't know who signed the

5   operating agreement?

6       A.    I mean, I would imagine that I would

7   have signed as the president of the corporation,

8   but I'm sure I would have had a secretary or a

9   recording secretary sign as well for each of these

10  businesses.  It could vary who actually signed.  So

11  with all of these businesses, I would need to see

12  that actual document in front of me to tell you who

13  signed it.

14      Q.    Is it your testimony that each business

15  signed an agreement with Famous Bourbon Management

16  Group, Inc.?

17      A.    No.  Can I clarify that now?

18      Q.    Uh-huh.

19      A.    That's a no unless I see the documents

20  in front of me, because it's possible where there

21  might be documents.  I'll just have to see our

22  files to see.

23      Q.    Okay.  Who's Joseph Ascani?

24      A.    He is one of our general managers.

25      Q.    At what locations has he worked?

1    **A.**    At what location, like actual physical

2 location, or which businesses does he work for?

3    **Q.**    Both.

4    **A.**    Well, as general manager, he goes from

5 location to location working for I believe all of

6 those businesses that we listed under the umbrella.

7    **Q.**    What does he do on a daily basis?

8    **A.**    You would have to check with him to see.

9    **Q.**    But he has a function with each of the

10 companies under the umbrella?

11    **A.**    What do you mean by does he have a

12 function?

13    **Q.**    He works and makes rounds at all of the

14 ones we've mentioned?

15    **A.**    Correct.

16    **Q.**    And just to clarify at this stage, you

17 understand that the claim being made is by Mr.

18 Lawrence Richardson. Can you tell me what you know

19 about him?

20    **A.**    I don't know anything about him besides

21 that he worked for us.

22    **Q.**    Do you know where he worked?

23    **A.**    I found out through the course of this

24 deposition that he worked at I believe Jazz Cafe

25 and I believe Fiorella's on Decatur he was an

1  else?

2      **A.**      Well, it would depend on which managers

3  we're referring to.  Some of our low-level managers

4  -- we have a lot of turnover at times.  So some of

5  them I might just hear their name.  I might not

6  actually meet them or have discussions with them,

7  but some of our managers have been with us for a

8  few years.  Those are the ones who I would go to

9  directly to handle any issues that we might have

10  with anything.

11      **Q.**      Do those people have different titles to

12  indicate a higher level manager, because I've

13  noticed you called several people managers even at

14  the business office versus the location?  Is there

15  some delineation?

16      **A.**      There is, but it kind of fluctuates with

17  each person, because some of our managers who work

18  in the business office are more of -- not by the

19  general definition of the term of being a general

20  manager, but they oversee some of our location

21  managers.  So they'll have some of the managers

22  report to them versus if they were an actual

23  general manager who oversees everything.  The

24  definition for each kind of varies with each

25  person.

1    Q.    Location managers would be the people

2 individualized to one restaurant or bar?

3    A.    Correct.

4    Q.    And the general managers, generally,

5 they rotate around amongst the umbrella companies?

6    A.    Correct.

7    Q.    But there's also managers from the

8 Metairie location that interact with those

9 individuals?

10    A.    No.  Some of our managers interact with

11 the location managers where they consider

12 themselves to be the general manager at those

13 locations, but they report back to our actual

14 general manager.  The people who work in the

15 business office are business office employees who

16 don't really have any titles per se.

17    Q.    So the people on location can also be

18 called general managers?

19    A.    By the business or by themselves?

20    Q.    By anyone.

21    A.    They refer to themselves as general

22 managers before where we don't really view them

23 that way, where we just kind of have gone along

24 with it.

25    Q.    Do you call them location manager?

1   involved with the inventory, and as we got so big,

2   I wasn't involved so much in handling things with

3   the construction aspect.  We had other people who

4   were handling that then.  So I just got more

5   focused on the inventory.

6       Q.    Okay.  And did that continue, or did you

7   have some change in responsibilities from then

8   until this point?

9       A.    No.  That's kind of continued on like

10  that.

11      Q.    Is there a human resources department in

12  your company or umbrella of companies?

13      A.    No.

14      Q.    Are there employee handbooks distributed

15  in the last three years amongst your companies?

16      A.    I'm not sure if they were distributed.

17  I know there were some that were made.

18      Q.    Were they made and not produced?

19      A.    I'm not sure.

20      Q.    Why would you say it like that?

21      A.    Because we instructed one of our

22  managers, Rebecca Williams, to put together a

23  handbook for locations for the employees.  I'm not

24  sure if the task ever got completed where she sent

25  them out.

1      Q.      I'm sorry.  Rebecca?

2      A.      Williams.

3      Q.      Was it the same for all companies, or

4  was it individualized?

5      A.      I'm not sure.

6      Q.      Did you see any draft of it?

7      A.      I believe so.

8      Q.      Who instructed her to undertake that

9  task?

10     A.      It might have been a combination of

11  people, because I know for each of the businesses,

12  we all had things that we wanted to try to get more

13  uniform and get things on a schedule where each

14  person knew what their daily responsibilities were.

15          So I know I, for instance, gave her a

16  list of daily tasks that each person had to do, and

17  I instructed her to come up with some other daily

18  responsibilities for opening and closing

19  procedures, and I believe maybe my father might

20  have had some information that he wanted to make

21  sure that they had available on a form so they knew

22  what they were responsible for, but I'm not sure

23  what that would have been.

24     Q.      Do you know what his topics were

25  specifically that he was interested in?

1      **A.**    No.

2      **Q.**    Do you have the power to make changes to

3  pay practices and the policies that we've talked

4  about that your father has set forth with these

5  companies?

6      **A.**    Yeah, I do.

7      **Q.**    In the areas of pay practices and

8  policy, have you made any changes?

9      **A.**    I have not, no.

10      **Q.**    Was any of that one of your requested

11 requirements in the handbook that was being

12 drafted?

13      **A.**    Not to my knowledge.

14      **Q.**    Has anybody to your knowledge requested

15 a change to the pay practices and policies?

16      **A.**    Not as far as I know.

17      **Q.**    Are you aware of any complaints about

18 pay in the last three years?

19           MR. PANAGOULOPOULOS:

20                Objection, vague.

21 BY MR. JACKSON:

22      **Q.**    About -- well, let me ask this.  Are you

23 aware of any complaints related to not being paid,

24 not being paid properly, not being paid overtime in

25 the last three years?

129

1      MR. JACKSON:

2          Okay.  That's all I have.

3 BY MR. PANAGOULOPOULOS:

4      Q.    Going back over your position at these

5 corporations, as the owner, do you handle the

6 day-to-day affairs related to these businesses?

7      A.    The day-to-day operation of the business

8 on the site itself?

9      Q.    Yes, sir.

10      A.    No.

11      Q.    In delegation of actions to other

12 parties, what do you expect the parties you employ

13 to do for you?

14      A.    I'm sorry.  Can you rephrase that?

15      Q.    In delegating services related to

16 accounts payable and payroll to Aimee Tauzier, what

17 do you expect her to do for you?

18      A.    I expect her to do the accounts payable

19 and payroll and then handle all that paperwork.

20      Q.    In delegating aspects related to

21 managing the finances of the business to your

22 father, Guy Olano, Jr., what do you expect him to

23 do?

24      A.    I expect him to do that.

25      Q.    Now, in reviewing material prior to this

140

1          **REPORTER'S CERTIFICATE**

2          This certification is valid only for a
transcript accompanied by my original signature and
3  original required seal on this page.

4          I, **CHERYL L. OHLMEYER**, Certified Court
Reporter in and for the State of Louisiana, as the
5  officer before whom this testimony was taken, do
hereby certify that **GUY OLANO, III**, after having
6  been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinabove set forth in
7  the foregoing 138 pages;

8          That this testimony was reported by me in
the stenotype reporting method, was prepared and
9  transcribed by me or under my personal direction
and supervision, and is a true and correct
10  transcript to the best of my ability and
understanding;

11

12          That the transcript has been prepared in
compliance with transcript format guidelines
required by statute or by rules of the board, and
13  that I am informed about the complete arrangement,
financial or otherwise, with the person or entity
14  making arrangements for deposition services; that I
have acted in compliance with the prohibition on
15  contractual relationships, as defined by Louisiana
Code of Civil Procedure Article 1434 and in rules
16  and advisory opinions of the board;

17          That I have no actual knowledge of any
prohibited employment or contractual relationship,
18  direct or indirect, between a court reporting firm
and any party litigant in this matter nor is there
19  any such relationship between myself and a party
litigant in this matter;

20

21          That I am not of counsel, not related to
counsel or the parties herein, nor am I otherwise
interested in the outcome of this matter.

22

23  _August 24, 2016_          _Cheryl L. Ohl_
    DATE SIGNED                CHERYL L. OHLMEYER
24                             CERTIFIED COURT REPORTER

25

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112